# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIPPLIN CARTER, 301 Madison Street NW, Washington, D.C. 20011, individually and on behalf of all others similarly situated, ) ) ) ) | |
| ) | Case No: _____ |
| Plaintiff, ) | |
| ) | Class Action Complaint |
| vs. ) | |
| ) | JURY TRIAL DEMANDED |
| UNIVERSAL MUSIC GROUP, INC.; SONY CORPORATION OF AMERICA; BERTELSMANN MUSIC GROUP; SONY BMG MUSIC ENTERTAINMENT; CAPITOL RECORDS, INC. dba EMI MUSIC NORTH AMERICA; WARNER MUSIC GROUP CORP., ) ) ) ) ) ) ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff KIPPLIN CARTER ("Plaintiff"), on behalf of himself and all others similarly situated, by and through counsel, hereby alleges as follows:

### INTRODUCTION

1.      Defendants Universal Music Group, Inc., Sony Corporation of America, Bertelsmann Music Group, Capitol Records, Inc. dba EMI Music North America, Warner Music Group Corp., and Sony BMG Entertainment (collectively referred to herein as the "Major Labels" or Defendants) together hold copyrights to at least 85% of digital music recordings.

2.      The Major Labels used their dominant positions as copyright holders to delay the creation of an online market for the purchase of digital music downloads

1

("Online Music") in order to protect the profits they earned on compact discs ("CDs"). Once it became apparent that they could no longer forestall the online market, the Major Labels engaged in a combination and conspiracy to fix, raise, maintain, and stabilize the royalty rates they charge for Online Music.

3.    Through the use of "most favored nation" clauses ("MFN clauses"), the Major Labels have collectively set royalty rates charged to services licensing Online Music for purchase such as iTunes Music Store, MusicMatch, Napster, Yahoo, Rhapsody, etc. ("Online Music Retailers") at approximately 65 cents per download. The royalty of approximately 65 cents translates to a 99 cent retail price, which is roughly the same as, or slightly higher than, the cost per song on a CD. This price ensures that the Major Labels will earn supra-competitive royalties on legal downloads and also ensures consumers are unlikely to be lured away from CDs, thereby enabling the Major Labels to similarly charge supra-competitive prices on CDs.

4.    This action is brought by Plaintiff on behalf of a class of persons and entities that have been forced indirectly to pay artificially-inflated, non-competitive royalties to the Major Labels on their purchases of Online Music and CDs from April 27, 2002 to the present ("Class Period"). Defendants' conduct violates, *inter alia*, federal and state antitrust statutes and state common laws of unjust enrichment. Plaintiff seeks injunctive relief and damages for herself and the class as a result of the Major Labels' unlawful conduct.

## JURISDICTION AND VENUE

5.    Jurisdiction is conferred upon this judicial district pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and 28 U.S.C. § 1331 and 1337.

6.    The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and which some members of the proposed class are citizens of a different state than of a defendant.

7.    Venue is proper pursuant to 28 USC § 1391(a) because Defendants transact business in this district, and because thousands of class members are located in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district. The acts complained of have had, and will continue to have, substantial anticompetitive effects in this district. Finally, Plaintiff resides in this district.

## PARTIES

8.    Plaintiff Kipplin Carter is a resident of Washington, DC. During the Class Period, Plaintiff purchased Online Music and CDs indirectly from Defendants.

9.    Defendant Sony Corporation of America ("Sony") is a New York corporation with its principal place of business in New York, New York. Sony is the U.S. subsidiary of Sony Corporation, which is based in Tokyo, Japan.

10.    Defendant Bertelsmann Music Group, Inc. ("Bertelsmann") is a Delaware corporation with its principle place of business located in New York, New York. Defendants Sony and Bertelsmann merged their U.S. music operations on or about August 2004. As a result of the merger, all copyrights and licensing agreements of each defendant were transferred to Defendant Sony BMG Music Entertainment, Inc.

11.    Defendant Sony BMG Music Entertainment, ("BMG") is a joint venture between Sony and Bertelsmann. Sony and Bertelsmann have equal ownership of BMG.

12.     Defendant Capitol Records, Inc,. dba EMI Music North America, is a Delaware corporation with its principle place of business located in New York, New York.

13.     Defendant Warner Music Group Corp. ("Warner") is a Delaware corporation with its principal place of business located in New York, New York.

14.     Defendant Universal Music Group, Inc. ("Universal") is a Delaware corporation with its principal headquarters located in Santa Monica, California. Universal is a subsidiary of the French company Vivendi Universal.

## UNNAMED CO-CONSPIRATORS

15.     The Recording Industry Association of America ("RIAA") is a trade association claiming to represent companies that "create, manufacture, and/or distribute approximately 90% of all legitimate sound recordings produced and sold in the United States." The RIAA lobbies on behalf of the music industry and frequently represents its members in litigation. All of the Major Labels are members of the RIAA, directly and through their subsidiaries, and the Major Labels have control over the association by providing a majority of its budget and nominating the majority of its board of directors. The RIAA has conspired with the Major Labels and participated in the illegal activities described herein by providing the Major Labels with a form to exchange competitive information and to coordinate their scheme to fix and maintain royalty prices for online music.

16.     Various other persons, firms, corporations, or joint ventures not named as defendants herein, the identities of which are presently unknown, may have participated

as co-conspirators in the Major Labels' illegal activities by performing acts and making statements in furtherance of the illegal combination and conspiracy described herein.

## TRADE AND COMMERCE

17.     During all or part of the Class Period, each of the Defendants, itself or through its affiliates or subsidiaries, sold Online Music in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States to Plaintiff and members of the Class.

## RELEVANT MARKET

18.     The relevant product markets are the market for Online Music and the market for CDs. The relevant geographic market is the United States.

19.     At all relevant times herein, Defendants possessed a collective market share in the relevant product and geographic markets over 85%.

## FACTUAL ALLEGATIONS

20.     Defendants Sony, Universal, BMG, Warner, and Capitol are music industry recording labels that collectively hold 85% of the copyrights in the recorded music industry. As copyright holders, the Major Labels have the exclusive right to manufacture, sell, or otherwise distribute copies of that music in any form. The other 15% of copyrights are held by independent labels, most of which use the Major Labels to distribute their music.

21.     For decades, the music industry organized around analog technology platforms due to the fact that the deterioration in quality upon subsequent reproductions of analog works acted as a natural impediment to content piracy. The development of digital technology, however, removed the natural advantages afforded to copyright

owners by allowing perfect reproductions across unlimited generations and providing alternative channels of distribution which could not easily be controlled or monitored.

22.     Since the mid-1980s, the Major Labels have sold music in digital format on compact discs ("CDs"), on which they have enjoyed 30% to 40% profit margins, or about $5.00 profit per CD.

23.     Although the technology enabling the transfer of digital music over the internet has been available since at least 1994, the Major Labels used their substantial market power to impede the development of the market for Online Music in order to protect their profits in the CD market.

24.     In the late 1990s, MP3.com and Emusic (then called Goodnoise) requested licenses from the Major Labels to sell digital song downloads on the internet. Fearing that individual song downloads would undercut CD sales, the Major Labels refused these requests.

25.     In 1999, Napster exploded onto the internet using "peer-to-peer" file sharing architecture, which allowed users to open their computer's music library to the world. Napster served as a central directory to every user's hard drive, but permitted the uploading and downloading of music directly from user to user. In its first year alone, Napster had twenty million users. Other peer-to-peer file sharing services soon followed.

26.     Although the recording industry denounced music sharing as equivalent to theft, many users felt justified in using the service for a number of reasons. Users believed that the quality of new albums had decreased by the mid-1990s, with the typical bestselling album containing only one or two good songs bundled with many low-quality "filler" songs. Additionally, the price per track had greatly increased as an increase in the

overall price of CDs was coupled with a decrease in the number of tracks included with each CD. Finally, users praised the file sharing services because they enabled them to obtain hit songs without having to buy an entire album.

27.    What consumers embraced, the music industry loathed. The Major Labels were deeply entrenched in an existing business model of physical distribution and saw CD sales plummet as a result of internet file sharing services. While the Major Labels argued piracy to the public, they were really concerned about control over the promotion and distribution of music. They were not interested in redesigning a distribution business model that had been successful for nearly one hundred years.

28.    Beginning in 2000, the Major Labels, represented by the Recording Industry Association of America ("RIAA"), launched a three-pronged attack: (1) to shut down Napster and other file sharing services with copyright infringement lawsuits; (2) to obtain government support for the industry's battle against illegal online distribution of music; and (3) to sue file sharers. The unwritten corollary to this strategy was the Major Labels' refusal to authorize third parties to legally sell and distribute music online.

29.    In order to pacify critics and to wrest some control from Napster, the Major Labels started their own online services. These services, however, were ill-conceived and likely designed to fail in order to steer consumers back to CDs. These services were difficult for consumers to navigate and use and their expensive pricing of $2.50 to $3.50 per song turned off many early adopters of the service. Furthermore, users were actually only renting the tracks; after a certain point the files expired and could not be played again without repurchase. The services quickly failed. As one commentator

wrote, "consumers didn't care to pay $3 for a song wrapped in clunky security software …"[1]

30.     In early 2001, in response to a threat by Congress to impose forced licensing, the Major Labels consolidated their catalogs into two non-overlapping joint ventures, MusicNet (Universal and Sony) and Pressplay (Capitol, Warner, and BMG) to license music on the internet.  This structure allowed the Major Labels to license their music to distribution companies they ran, thereby controlling the manner and pricing of music distribution over the internet.  Other businesses wanting to sell digital music on the internet were required to enter into arrangements with MusicNet and Pressplay.

31.     In March 2001, the Antitrust Division of the United States Department of Justice ("DOJ") launched an investigation into MusicNet and Pressplay.

32.     It was immediately clear that MusicNet and Pressplay were designed to steer users back towards CD purchases.  They refused to license for less than two dollars per song, and in some cases charged as much as $3.50 per song.  One source reported that MusicNet refused to license to small entities, and in certain cases, required companies to make advance payments of as much as $750,000 before even entering into talks to license their music.  Moreover, the licenses were for streaming and tethered downloads, thus precluding users from burning songs to CDs or transferring them to MP3 players.

33.     In July 2001, Napster shut down its entire network in order to comply with a preliminary injunction issued in the RIAA's copyright infringement lawsuit.  On September 24, 2001, the case was partially settled.  Napster agreed to pay music creators and copyright owners a $26 million settlement for past, unauthorized uses of music, as

---

[1]  Michael Learmonth & Ronna Abramson, *In Digital Music, First You Must Eat Your Rival*, The Industry Standard, Aug. 6, 2001.

well as an advance against future licensing royalties of $10 million.  In order to pay those fees, Napster attempted to convert its free service to a subscription system.

34.    On October 10, 2001, Judge Patel of the United States District Court for the Northern District of California heard oral arguments on the RIAA's request for summary judgment in its copyright infringment case against Napster.  Napster argued in response that the agreements that the Major Labels had forged to create MusicNet and Pressplay amounted to horizontal price-fixing combinations by setting wholesale and possibly retail prices for their digitally distributed recordings.  Judge Patel took these allegations seriously, remarking, "I'm really confused as to why the plaintiffs came upon this way of getting together in a joint venture.  Even if it passes antitrust analysis, it looks bad, sounds bad and smells bad."[2]

35.    Following Napster's allegations of price-fixing, the DOJ expanded its investigation, calling for closed-door meetings with industry executives and sending out civil investigative damands to the RIAA, MusicNet and Pressplay.

36.    Both MusicNet and Pressplay and their respective record label parent submitted "White Papers" to the DOJ summaryizing their arguments as to why the DOJ's concerns were unfounded.  The Major Labels also provided the DOJ with documents related to the joint ventures.  As part of this production, Universal provided the DOJ with a set of communication guidelines drafted by its lawyers, which were ostensibly intended

---

[2]  Peter Jan Honigsberg, *The Evolution and Revolution of Napster*, 36 U.S.F. L. Rev. 473, 482 (2001-2002).  In her written opinion denying summary judgment, Judge Patel reiterated her concern about the antitrust implications of the joint ventures: "[E]ven a naif must realize that in forming and operating a joint venture, plaintiffs' representatives must necessarily meet and discuss pricing and licensing, raising the specter of possible antitrust violations. [citation omitted]  These joint ventures bear the indicia of entites designed to allow plaintiffs to use their copyrights and extensive market-power to dominate the market for digital music distribution. [citation omitted]  Even on the undeveloped record before the court, these joint ventures looks bad, sound bad and smells bad." *In re Napster, Inc. Copyright Litig.*, 191 F. Supp.2d 1087, 1109 (N.D. Cal. 2002).

to avoid antitrust violations by previenting Pressplay employees from discloing competitively sensitive information to Pressplay's record label parents.

37.    Napster's argument and the responses of Judge Patel and the DOJ apparently alarmed the Major Labels enough to cause a sudden paradigm shift. In July 2002, Listen.com became the first online company to secure licenses from each of the Major Labels. Most of the music available on Listen.com, however, could only be listened to in streaming format, and not burned to CDs.

38.    In April 2003, Apple announced that it had negotiated licensing deals with the Major Labels and thousands of independent labels. Apple's iTunes Music Store finally provided consumers "Napster-like" access to online music—songs could be quickly and easily downloaded without a subscription for 99 cents per song or $9.99 for an album. iTunes users quickly racked up one million sales in the iTunes Music Store in the first week of business. By October 2003, Apple had sold 14 million legal downloads, making it the most successful legal Online Music Retailer in the world.

39.    With the proven success of iTunes, the Major Labels began licensing their content to a wide number of Online Music Retailers in the United States and abroad, removing many restrictive music licensing terms from their agreements, and allowing Online Music Retailers to deliver the music in a number of different formats and terms.

40.    As the Online Music Retailers exploded, Sony and Universal sold Pressplay to Roxio, an independent software company that absorbed Pressplay into its legal version of Napster.

41.    In December 2003, the DOJ announced the closing of its investigation of MusicNet and Pressplay. The DOJ concluded:

> The Division's investigation of the licensing by the major
> record lables revealed no evidence that the major labels
> impermissibly established the terms on which they licensed
> their music to third parties. Not only did the terms of the
> licenses that the major labels granted to third parties vary
> significantly, but it is also apparent that each lable adopted
> its own approach toward the distribution of its music by
> third parties over the Internet. Safeguards adopted by both
> pressplay and MusicNet to prevent the sharing of
> confidnetial information among their participants also
> appear to have succeeded in previentin the inappropriate
> exchange of information amon the major record labels
> through the medium of the joint ventures.

42.    With respect to the alleged attempt to suppress the growth of internet-

based music distribution, the DOJ noted that the "poor quality and restrive nature" of the

services "provided some support" for the theory that the Major Labels were attempting to

"impeded the growth of the Internet" for music distribution. Nevertheless, the DOJ

concluded that the Major Labels had in fact granted licenses to other online music

distribution services, and that the market for Online Music had continued to develop

despite the Major Labels' participation in the joint ventures.

43.    The DOJ's findings were a near-verbatim recitation of the arguments

advanced in the two White Papers. For example, with respect to variation in licensing

terms, the Pressplay White Paper states:

> The absence of spillovers [of licensing information] is
> demonstrated conclusively by the wide dispersion between
> the terms of [Sony's] licenses with third party services, the
> terms of [Universal's] licenses with thir dparty services,
> and the terms of pressplay's agreements with [Sony],
> [Universal], and third party licensors.

*In re Napster Copyright Litig.*, No. MDL-00-1369, 4 (N.D. Cal. April 21, 2006) (quoting

Pressplay White Paper) (slip opinion at docket # 886).

44.    With respect to firewalls, the Pressplay White Paper states that "both of the parent labels, as well as pressplay, have established and adhered to durable and effective firewall arrangements to prevent such spillover." *Id.* (quoting Pressplay White Paper).  Similarly, the MusicNet White paper states that "MusicNet purposefully put safeguards in place to prevent exchanges of information, or other conduct, that could negatively affect competition.  MusicNet is not aware of any breaches of these safeguards." *Id.* (quoting MusicNet White Paper).

45.    Information contained in the White Papers was highly misleading if not entirely false.  For example, despite the assertions to the contrary, competitively sensitive information was exchanged through the joint ventures.

46.    Additionally, there is limited if any variation in licensing terms of the Major Labels because each of the Major Labels mandates most favored nation clauses ("MFN clauses") in their licensing agreements with the Online Music Retailers.  Such clauses guarantee that if one of the Major Labels negotiates a better rate with one of the services, the others will see corresponding rate hikes.

47.    In other words, if one of the Major Labels was to negotiate a royalty price of 65 cents, and another Major Label was to subsequently negotiate a royalty price of 68 cents, the first Major Label could invoke the MFN clause to raise its price to 68 cents.

48.    MFN clauses are a means of collusion by the Major Labels.  They create transparency by which each knows the terms their competitors are getting because they are the same as their own.  Because the clauses forbid the Major Labels from receiving worse terms than their competitors, the clauses fix prices and restrict competition.

49.    In some cases, the MFN clauses allow the Major Labels to audit the terms of deals the Online Music Retailers have with other record companies to ensure that the Major Labels are receiving the highest pricing terms possible.

50.    The White Papers submitted to the DOJ during its investigation omit any mention of MFN clauses.  The use of MFN clauses is fundamentally incompatible with assertions in the White Papers that the licenses granted by the Major Labels show a variation of terms.

51.    The music industry's own market research indicates that the average consumer would be attracted to legal Online Music, as opposed to music piracy, at a price of 25 cents per download.  The 25 cents figure allows the Major Labels about 10 cents of profit per download.

52.    Instead, royalty rates have been collectively set at approximately 65 cents per download through the use of MFN clauses, translating to a 99 cent retail price.  A price of 99 cents per song is roughly the same as, or slightly higher than, the cost per song on a CD.  This price ensures that the Major Labels will earn supra-competitive royalties on Online Music and also ensures consumers are unlikely to be lured away from CDs, thereby enabling the Major Labels to maintain supra-competitive prices on CDs as well.

53.    The music market has change dramatically since the DOJ closed its investigation in 2003.  Although consumers are buying fewer CDs, Online Music sales have soared.  Sales of digital tracks more than doubled in 2005, climbing to 352 million.  Perhaps most telling is that since 2002, revenues have only dropped by $340 million— about 2.7%.

54.    In December 2005, the Attorney General of the State of New York launched in investigation into whether the Online Music pricing practices of industry participants violate federal and state antitrust laws.

55.    In March 2006, the United States Department of Justice similarly launched an investigation into the possibility of anticompetitive practices in the music-download industry.

56.    In an April 21, 2006 opinion in the Napster copyright litigation, Judge Patel concluded that claims in the White Papers submitted during the earlier DOJ investigation regarding variations in the licensing terms among the Major Labels and the firewalls between the joint ventures and the Major Labels were deliberately misleading, if not completely false. *In re Napster Copyright Litig.*, No. MDL-00-1369 slip opinion at 4, 10, 11.

57.    Thus, notwithstanding the DOJ's earlier conclusions, the Major Labels have conspired to delay the development of an online market and to fix, raise, and maintain prices in both the Online Music market and the CD market.

## INJURY TO PLAINTIFF AND THE CLASS

58.    Plaintiff and the Class have been injured as a direct, foreseeable and proximate result of Defendants' misconduct alleged herein.  Plaintiff and Class purchased Online Music from Online Music Retailers who were forced to pay supra-competitive royalty prices, which were passed on to Plaintiff and the Class.  Such injury would not have occurred but for Defendants' conduct alleged herein.

**THE INTEREST OF THE GENERAL PUBLIC**

59.    Defendants have fixed, raised, and maintained the royalty rates passed on to purchasers of Online Music and CDs.

60.    Because Plaintiff has reason to believe that Defendants have engaged in, and will continue to engage in the unlawful practices set forth herein, she, on behalf of the General Public of the District of Columbia, has reason to believe that Defendants have caused, and will continue to cause damage and adverse effects to the General Public of the District of Columbia.  For these reasons, Plaintiff acts for the benefit of the General Public of the District of Columbia.

**CLASS ACTION ALLEGATIONS**

61.    The Class Period is from April 27, 2002 to the present.

62.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b) on behalf of a Class defined as:

> Nationwide Class
> All persons or entities residing in the United States that purchased, not for resale, Online Music and/or CDs produced, manufactured, licensed, distributed, and/or sold by Defendants between April 27, 2002 and the present. Excluded are Defendants and any unnamed co-conspirators, as well as their parents, subsidiaries, affiliates, officers, directors and employees.

63.    The Class includes two sub-classes as follows:

> Online Music Damages Sub-Class
> All persons or entities residing in the Indirect Purchaser States that purchased, not for resale, Online Music produced, manufactured, licensed, distributed, and/or sold by Defendants between April 27, 2002 and the present. Excluded are Defendants and any unnamed co-conspirators, as well as their parents, subsidiaries, affiliates, officers, directors and employees.

CD Damages Sub-Class
All persons or entities residing in the Indirect Purchaser
States that purchased, not for resale, CDs produced,
manufactured, licensed, distributed, and/or sold by
Defendants between April 27, 2002 and the present.
Excluded are Defendants and any unnamed co-
conspirators, as well as their parents, subsidiaries, affiliates,
officers, directors and employees.

"Indirect Purchaser States" refers to Arizona, California, District of Columbia, Florida,

Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New

Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West

Virginia, and Wisconsin.

64.     The Class is so numerous that joinder of all members is impracticable.

There are thousands of members in the Classes who are geographically dispersed

throughout the United States.

65.     Plaintiff's claims are typical of the claims of the members of the Class

because Plaintiff and all Class members were damaged by the same wrongful conduct of

the Defendants alleged herein.

66.     There are questions of law and fact common to the Class which

predominate over any questions affecting only individual Class members.  Such common

questions include:

> a.     Whether Defendants have engaged in a continuing combination
>        and conspiracy to fix and maintain prices in the relevant market;
>
> b.     The duration and extent of any such combination or conspiracy
>        alleged herein;
>
> c.     Whether Defendants and each of them were participants in any
>        such combination or conspiracy alleged herein;

16

      d.      Whether Defendants fixed prices in the relevant markets at supra-competitive levels;

      e.      Whether Defendants' conduct caused damage to Plaintiff and members of the Class, and if so, the appropriate measure of such damages.

67.      The claims of the Plaintiff are typical of the claims of the Class, and Plaintiff has no interest adverse to the interests of other members of the Class.

68.      Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced and competent in the prosecution of complex class actions and antitrust litigation.

69.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford to individually litigate an antitrust claim against large corporate Defendants.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

70.      Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Classes as a whole.

<u>COUNT I</u>
**(Violation of Section 1 of the Sherman Act, 15 U.S.C. §1)**

71.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

72.    This Count is alleged against all Defendants on behalf of the Class.

73.    Defendants' conduct as alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

74.    Defendants, together with their co-conspirators, conspired to delay and impede the creation of on Online Music market, as described herein, in order to protect their profits in the CD market.

75.    Once Defendants were no longer able to forestall competition in the Online Music market, they conspired to restrain trade in the market for Online Music by agreeing to fix, raise, maintain, or stabilize prices for Online Music. The supra-competitive prices maintained in the Online Music market had the dual effect of allowing Defendants to maintain supra-competitive prices in the CD market.

76.    Plaintiff and members of the Class have been injured and continue to be injured in their business and property by reason of Defendants' unlawful acts alleged in this Count. Their injury consists of paying higher prices for Online Music and CDs than they would have paid in the absence of Defendants' conduct. This injury is of the type the above statute was designed to prevent and directly results from Defendants' unlawful conduct.

77.    Plaintiff and the Class are entitled to equitable and injunctive relief to prevent Defendants' continuing unlawful conduct.

## COUNT II
### (Violation of the Antitrust Statutes of the Indirect Purchaser States)

78.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

79.    This Count is alleged against all Defendants on behalf of the Online Music Damages Sub-Class and the CD Damages Sub-Class.

80.    By reason of the foregoing, Defendants have violated District of Columbia Code §28-4501 *et seq.*

81.    By reason of the foregoing, Defendants have also violated the antitrust laws of the states of Arizona, California, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, and Wisconsin.

82.    Class members in each of the states listed above paid supra-competitive prices for Online Music and CDs purchased indirectly from Defendants, and as a result, have been injured because of Defendants' wrongful and collusive conduct regarding royalty prices.

83.    Plaintiff and the Class hereby seek actual damages for their injuries caused by the aforementioned violations in an amount to be determined at trial. Plaintiff and the Class further seek treble damages reasonable attorneys' fees, and costs under the state antitrust laws where allowed.

## COUNT III
### (Violation of the District of Columbia Consumer Protection Procedures Act)

84.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

85.    This Count is alleged against all Defendants on behalf of the General Public of the District of Columbia pursuant to District of Columbia Code §28-3905(k)(1).

86.    By reason of the foregoing, Defendants have violated District of Columbia Code § 28-3904.

87.    Plaintiff and the General Public of the District of Columbia hereby seek treble damages or statutory damages in the amount of $1,500 per violation, whichever is greater, pursuant to D.C. Code § 28-3905(k)(1).  Plaintiffs and the General Public of the District of Columbia further seek reasonable attorneys' fees and costs.

## COUNT IV
### (Unjust Enrichment)

88.    Plaintiff incorporates and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

89.    This Count is alleged against all Defendants on behalf of the Class.

90.    Defendants' conduct has resulted in Plaintiff and the Class paying supra-competitive prices for Online Music and CDs.  Allowing Defendants to retain a financial windfall generated by collusion and anticompetitive conduct would be unjust and inequitable.  Such gains resulted directly from overpayments made by Plaintiff and Class, thus they are entitled to a return of these overpayments stemming from the willful and knowing conduct of the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order setting forth the following:

a) certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as the representatives of the Class, and designating her counsel as counsel for the Class;

b) declaring that Defendants' conduct is in violation of Section 1 of the Sherman Act;

c) declaring that Defendants' conduct is in violation of antitrust statutes in the Indirect Purchaser States;

d) declaring that Defendants' conduct is in violation of the D.C. Consumer Protection Procedures Act;

e) granting Plaintiff and the Sub-Classes damages as permitted by law;

f) granting Plaintiff and the General Public of the District of Columbia treble damages or statutory damages in the amount of $1,500, whichever is greater;

g) granting Plaintiff and the Class their costs of prosecuting this action, together with interest and attorneys' fees, including such as allowed by statute, experts' fees and costs; and

h) granting such other relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the members of the Class, hereby demands trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED:  January 31, 2007          Respectfully Submitted,

By _Benj. J. Weir_____

Douglas G. Thompson  (DC Bar #172387)
Tracy D. Rezvani (DC Bar # 464293)
Karen J. Marcus (DC Bar #486435)
Benjamin J. Weir (DC Bar# 494045)
FINKELSTEIN THOMPSON LLP
1050 30th Street NW
Washington, DC 20007
Tel:  202-337-8000
Fax:  202-337-8090

07-220
JDB

**I (a) PLAINTIFFS**

Kipplin Carter
301 Madison Street, NW
Washington, DC 20011

11081

**DEFENDANTS**

Universal Music Group, Inc.; Sony Corporation of America; Bertelsmann
Music Group; Sony BMG Music Entertainment; Capitol Records, Inc.
dba EMI Music North America; Wartner Music Group Corp.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

DC

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT     New York, NY
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Benjamin J. Weir
Finkelstein Thompson, LLP
1050 30th Street, NW
Washington, DC 20007
(202) 337-8000

ATTORNEYS (IF KNOWN)

CASE NUMBER 1:07CV00220

JUDGE: John D. Bates

DECK TYPE: Antitrust

DATE STAMP: 01/31/2007

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

◉ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

**III CITIZENSHIP**
FOR PLAINTIFF AND ○

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

◉ **A. Antitrust**

(X) 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/* *2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA* *(non-employment)* | ○ **L.** *Other Civil Rights* *(non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. Section 1 - Antitrust Violations of the Sherman Act

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS  ☒  ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in compl
**JURY DEMAND:**   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  1/31/07   SIGNATURE OF ATTORNEY OF RECORD  *Ben f Lam*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.